23-2189. Counsel for appellant, if you would make your appearance and we'll proceed. Good morning. I'm Dean Sandiford from the Federal Defenders and I'm here for Christopher Kee. The sole issue in this appeal is whether Mr. Kee is entitled to reversal due to the government's repeated violations of his due process rights under Doyle v. Ohio. And at this point the dispute between the parties is fairly narrow. The government concedes that it plainly violated Doyle by repeatedly telling the jury that Mr. Kee had never told his story before trial and made it up on the stand. Their only claim is that these violations weren't prejudicial and that's wrong for several reasons. This case was a credibility contest between Ms. Chinchilla and Mr. Kee. Mr. Kee's claim of self-defense had support, especially in light of Ms. Chinchilla's prior conviction for assaulting him. And the Doyle violations were extremely damaging because they invited the jury to draw the natural and damning inference that if Mr. Kee were truly innocent, he would have spoken up long before trial. The government mainly claims that the violations weren't prejudicial because it achieved the same impeachment impact by pointing out that Mr. Kee never reported Ms. Chinchilla's abuse before he was arrested. But that impeachment was a wash because Ms. Chinchilla's was impeached in the same way and it's weak impeachment anyway because jurors naturally understand why someone might be hesitant to report their romantic partner to the police. The Doyle violations, on the other hand, were one-sided and they were far more damaging. They invited the jury to infer that if Mr. Kee was truly innocent, he would have spoken up before trial. This is an extremely damaging inference because, as the Supreme Court said in Hale, jurors will naturally think that an innocent person would not just sit silent when accused of a serious crime. They do the opposite. They would loudly and strenuously assert their innocence. This point about jurors would understand that somebody would not be inclined to report their romantic partner. Is that just something that you're saying or is there some foundation in the record for that? It's not clear to me. I wouldn't drop a dime on my romantic partner. So, I mean, why do you believe that that's true? Well, I just think it happens a lot. We see this in a lot of cases where people don't report abuse or are hesitant to report abuse. There's nothing in the record, and I think our stronger argument on that point anyway is that both of them were impeached in this way. The jury also heard that Ms. Chinchillas didn't contemporaneously report abuse. So even if this type of impeachment was effective for these jurors, it applied to both witnesses in the same way and didn't give the government any advantage. The Doyle violations were very different because those were one-sided. Those were only against Mr. Kee. And it's a far more damaging inference because, again, as the Supreme Court said in Hale, people naturally expect someone who's accused of a serious crime but didn't commit it to speak up and say, hey, I didn't do that, or I was acting in self-defense. So when a person comes in for the first time at trial and the prosecutor exploits that and says, you're telling this story for the first time at trial, that's going to surprise jurors, and it's going to make them think that the person is not telling the truth because who would wait until that moment to first claim that they acted in self-defense? Is our review here for plain error? Yes, it is. So you have to show a reasonable probability that the outcome would have been different. I'm just having trouble from the evidence in this case. And the nuanced argument you make about whether or not Doyle was violated, which is kind of subtle in some ways, I'm having difficulty whether you established a reasonable probability, not possibility, but probability, that the outcome would have been different. So address that. Sure. I have several things to say about that. The first is that this was a close case in the sense that this was a credibility contest. The only people who were there that night were Ms. Chinchillas and Mr. Key, and they gave widely divergent stories about what happened. The physical evidence in the case, namely her injuries and the medical testimony, did not refute his claim of self-defense. The doctor testified that the wound on her palm was typically a defensive wound of the type that would be typically defensive, but he said he didn't ask her for details. And it's just as consistent with Mr. Key's story that she grabbed the knife as she was trying to wrest it away from him. That wound could have happened in exactly the same way. Third, this wasn't just one Doyle violation. These were repeated Doyle violations. Even under the government's counting, they happened during cross-examination, initial closing, and rebuttal closing. And this Court has said time and again that when a prosecutor leans into an argument like this in closing, that highlights the evidence for the jury and increases the likelihood of prejudice. Third, Mr. Key's claim of—well, I guess I'm on fourth now—but Mr. Key's claim of self-defense was plausible, particularly in light of Ms. Chinchillas' prior conviction for assaulting him. So there was—the motel manager who was present for at least part of this assault testified to this. He said that she seemed to be the aggressor. She was the one who was trying to keep the fight going and that she didn't seem afraid of him. This motel manager had no interest whatsoever in this case. He didn't know either of the parties. A completely disinterested witness who came in and testified that for that incident, she was the aggressor and wasn't afraid of him, which lends significant support to his claim of self-defense in this case. Does the constitutional nature of this violation have any role to play in the plain error analysis here? Well, this Court has said that plain error applies less rigidly in that context. You know, I don't know that the cases have really elaborated on that, but there is, at least theoretically, a little bit more leeway when you're dealing with a constitutional error. You know, I'd like to say a few words— I assume there was no trial counsel in this case. I was not, no. I was not trial counsel. I'd like to say just a couple of words about the split verdict, which is something that the government emphasizes in its brief, and I have a few responses to that. The first is that the verdict is irrelevant to the prejudice inquiry under Kristerna Gonzalez, which says that it's subjective and based solely on the trial record. And the reason for that is we don't know what happened in the jury room. There's always concerns that the jury could have acted irrationally. So we disregard what the jury's verdict is and look solely to the evidence to decide whether or not there was prejudice. But if you're going to look into it at all, the jury verdict actually makes a lot of sense, even assuming that these Doyle violations had a lot of impact on the trial. Because Counts 1, 3, and 4, those were the counts that he was acquitted on. As even the government agrees, they had independent weaknesses, just the government's proof itself, lack of corroborating evidence, an expert who contradicted the complaining witnesses' claims. Count 2 was very different, because Count 2, Mr. Key admitted to the stabbing. He said it happened in self-defense. And for the jury to credit that, they would have to give some credence to his claim of self-defense. So if the Doyle violations undermined his credibility in a very significant way, they would only affect Count 2. Count 1 and 3 and 4 had separate problems. The jury didn't even have to look at his testimony to decide whether or not they had a reasonable doubt about those counts. I'd also like to speak for a minute about, you know, these statements were, the government points this out, these statements were more general, that he didn't tell his story before, until trial, which encompassed periods both after his arrest and before his arrest. But that's exactly what happened in Brecht. The questions were exactly the same. The defendant was asked whether he had told his story that the shooting was an accident in that case before trial, and then the prosecutor argued that same thing in closing arguments, which is exactly what happened here, and I believe is why the government has conceded plain error on those points. I mean, unless the court has further questions, I, you know, I think I've made my main points, and I think the briefs are pretty clear, and I'd be happy to reserve the remainder of my time. Okay. All right. Thank you. Good morning, Your Honors. May it please the Court. Emil Keeney for the United States. As Mr. Sandover correctly said, we have conceded the first two prongs of the plain error test, and that is because of the statement in Brecht. Well, do you concede the fourth prong, too? You didn't make an argument about it. We didn't. I didn't feel like if you found the third prong against us that we would have much chance of succeeding on the fourth prong. So, yes, we are conceding that as well, assuming if you find prong three against us. Yes, I got that. So prong three is where everything happens in this case, and so the reason we think prong three hasn't been satisfied here, there's two principal reasons, and I'll address the first, I'll address the argument that Mr. Sandover raised for the first time in his reply brief, which is, look, what he's saying is the prejudicial impact is that once you're charged with a crime, a jury may understand why you don't report your significant other romantic partner to the police, but once you're charged with a crime, a jury would expect you to proclaim your innocence, and this is a damaging inference that the Doyle violations caused. And I would just say to that, that if, I mean, the test on plain error is that but for the error, what would have happened? So if the error had been called out, we still, and the judge had said, you can't talk about post-arrest silence. We still could have talked about that inference, that he failed to protest his innocence of the charges, and the reason for that is he testified, Mr. Key testified, that he became aware of the federal arrest warrant on this case in January of 2021, but he was not arrested, though, until April of 2021, so that's about a two or three-month period. You know, the testimony wasn't clear on that. I think our prosecutor was trying to establish that. I don't know that he did. He suggested that, and Mr. Key testified. No, no, Mr. Key testified that he was just out working, because he testified he worked out of town a lot. So, no, we did not argue flight as an inference, and that's not what I'm arguing today. What I'm arguing today is if you learn the police are looking for him for this charge of assaulting and stabbing his girlfriend, that a jury could properly have been told at that point that he should have said, hey, or our prosecutor should have said, hey, or our prosecutor could have asked him then. Why didn't you say, I'm the victim here? He didn't have a chance, because the prosecutors hadn't contacted him. They hadn't, they, I mean, he didn't have a chance to tell the prosecutors that, because he had no interaction with them. Well, there's, well, the only... Unless you think he should have sought them out, and frankly, there's a lot of people, probably most people, that simply would say, me, seek out a police officer simply to say I'm not guilty of a crime that I haven't been charged with? I don't think I'll do that. Well, the point, my point is, he was charged with it at that time, and he knew that there was a federal arrest warrant on those charges at that time, as he testified... How did he know that? Pardon? How did he know that? He didn't explain how he knew that, but he said, he testified at the pages I gave you, I learned in January 2021 that there was this arrest warrant out for me. Okay, let me understand the argument. So you're saying that on prong three, that what we could do is perceive that the government could have just as well used that same, the Doyle comments, it could have uttered those comments, and the jury could have understood them as relating to his pre-arrest behavior? I'm saying if the error had been, if either the district court had sui sponte noticed the error, or it had been brought to the court's attention, then the prosecutor would have been instructed not to talk about post-arrest to silence, but still could have talked about these other issues. That's what I'm saying. Where, what authority do you have? That's a fairly nuanced, and it strikes me novel, sort of prong three argument. I mean, what authority do you have for us doing that? I mean, ordinarily what we do is we just say, I mean, that presumes, well, if the error had been brought to the court's attention, well, it wasn't brought to the court's attention. So what we, you know, what our cases tell us to do is look at, but for this error, the focus being the error in the totality of the circumstances, you know, is there a reasonable likelihood that the result would have been different? This sort of notion of looking at what we could have, what the questioning could have permissibly gone to, what authority do you have for that? Because that seems to me that's a different sort of analysis than the one we ordinarily undertake on prong three. Well, I mean, I thought about that in preparing for this argument, and the only thing I can think of is that sometimes in this court, when cases of sentencing error, the court will sometimes say, well, if this had been brought to the court's attention, the court would have done X, Y, or Z, and that's what's likely on the facts of this case. So by analogy, I'm thinking, if the error had been pointed out and the court had ruled no, Mr. AUSA, you cannot talk about post-arrest silence. I think it's not realistic to assume that the prosecutor would have just then, oh, I can't talk about anything to do with this. He had things he could say with respect to the pre-arrest of silence, and in fact, he did talk about it with respect to the failure to talk to the police. I have trouble writhing my hand around your argument about pre-arrest silence, because he didn't have contact with the officers then, and so I don't have any, it doesn't seem to give me the opportunity to make a statement, and so I just don't think that's curious. I don't think a jury would feel that carried any way at all. Well, we don't know one way or the other what opportunity he had, but he didn't explain how he became aware of it, but he became aware that law enforcement was looking after him, looking for him, based on this warrant. That's all we know. Your statement that, well, the prosecutor could have said, he never volunteered that statement before he was arrested, I don't think a prosecutor is likely to have made that argument. It just doesn't strike me as having any force. Well, in his reply brief, defense counsel says that would be a powerful argument, to say that once you learn of charges, that the jury would be impressed by that, that you didn't stand up and say, wait, I didn't do any of this. I'm the victim here, not her. So I think there is authority to, I would rely on Hale for that. But I mean, to some extent, on plain error review, you're thinking about a counterfactual in all of these cases. Well, you are, but I mean, now I'm trying to think through as well, again, anew this argument that you're making. And it seems to me, if I understand it then, it's predicated on the notion that if this error had been brought to the court's attention, the court could have essentially said that you, prosecutor, cannot talk about post-arrest silence, but you can talk, and then the prosecutor would have said, OK, fine, well, I'll talk about the pre-arrest time when he knew about the warrant. Right. I think that's the most realistic thing. OK. All right. Well, that chain of events presupposes action that the court would take. You used the sentencing analogy. Presupposes action that the court would take when error is brought to its attention. Well, usually, under the third prong of plain error, we're not looking at what the court would do. We're looking at what the jury would do. We're saying that in the event that you remove the error, is there a reasonable probability that the jury's activity would have been different? And so the focus is different. It's focused on the jury's conduct, not the court's conduct. What you're talking about is remedial action by the court, and then what the government prosecutor would likely do in response to the remedial action. I mean, that's a whole different lens, isn't it? Well, I think that where I'm coming from on this is thinking about it as the plain error is, I mean, the concept of plain error is that it's the court's error. And so we think about what would have happened if the court had noticed this error and done things correctly. And now there's a lot of cases where I think you're correct. For example, if we had a pure Doyle case, if you contrast it with that, where in Doyle the facts were police set up, helped to set up, and then watched the drug transaction take place, and then you had an arrest immediately thereafter, then I don't think we would have any argument in that situation if the prosecutor said, hey, you didn't tell the police who arrested you. Because there's no period of time in which the defendant could have made a statement explaining himself to anyone that did not postdate his Miranda rights being read to him. He was Mirandized right during that initial police encounter and pretty much as soon as they said you're under arrest, he was Mirandized twice, as I understand it, once in the preliminary hearing and once at the time of the arrest. In Doyle? Yeah, I believe that's correct. No, I mean here. Oh, here? Yeah. I don't know what happened at arrest. The record doesn't say exactly what happened at arrest, but there were two arraignments. Mr. Key was arrested in Colorado and brought in for arraignment, and at that arraignment the court read his rights to him. And then he was brought to New Mexico about two weeks later, and the court did that again and said you have the right to remain silent. So both times the advice was on an arraignment? Correct. Okay, I, so, so, you, you, you, boy, I thought, I thought I remembered that, that the officers told him during the arrest that he had the right to remain silent. That's just not correct, apparently. I don't remember that, Your Honor. I think that April, I mean they may well have done so, and it was probably the same day. That's the only time, that's the only time I could imagine a credible argument that if he were innocent he would have said so then. But, and I guess the prosecutor could, could make that argument then, couldn't he? Could make what? Couldn't the argument, couldn't the prosecutor, either he or she, have made the argument that he, he did not state at the time of the arrest, hey, why are you arresting me? She's the aggressor here. Not if his Miranda rights were read at the arrest, Your Honor. He could, the prosecutor could not. If the, if the Miranda rights, I think it's more of a unclear issue if the Miranda rights had not been read to him at arrest. That was, we just, we're, I've misunderstood your answers. I've been, we've been two trains passing in the night. He was Mirandized at the time of the arrest. No, no, I don't, I don't know one way or the other, Your Honor. But there's, there was no testimony at trial about how the arrest went down. I don't see anything else in the record. But he was told at his arraignment on April 1st of 2021 that he had the right to remain silent. I believe there is authority. I don't remember what it is. But that, that the court's giving of that warning is just as, is just as valid or effective. I would hope so. Yeah, I'm not arguing that it's any different. I'm just saying I don't know what happened. I mean, I would hope it would be as powerful as an agent giving that advice. That's the same. But the point I'm making is, this is a different fact pattern than the one one might ordinarily see. Because what you're, what the Doyle error here is predicated on his silence after the two advisements that he received from judicial officers. That's correct. Yes, sir. All right. That's correct. And the prosecutor's statements that we admitted violate Doyle. They cross that line. And that, that's correct. What they're saying is that, that they're just simply saying this is the first time we've heard that. But, but then apparently they could have said validly he didn't make that argument at the time of the arrest. No. If, if his Miranda rights weren't read at the time of his arrest, I think they could make that argument. But if they were read, he could not. But we don't know one way or the other in this case what happened at the arrest. We don't even know for sure that he could have made that argument. Because just because your Miranda rights haven't been read to you, doesn't mean you don't have them. So that once he was confined at the arrest, even though his rights weren't read, he has those Miranda rights, which is not to be required to testify unless he is advised to confer it. He, he has those rights, but Doyle is triggered by the giving of the Miranda rights. Because the basis of Doyle is to say, look, we've implicitly promised you, Mr. Defendant, that, that you don't have to talk and you're not going to be penalized for not talking after this point. Could you remind me, do I understand correctly, there are two of the five statements that you claim are not Doyle-era? That's correct. And, and if you can just briefly remind me why, what's your premise for why they're not Doyle-era? Well, there's one during the closing to the effect that the defense attorney or the prosecutor said, look, the defense attorney doesn't even know his own client's story. And that's, I see them, I'm read. Can I continue? Yes, sir. And so the, the contention is by saying that, look, you, when the prosecutor said, defense counsel doesn't know his own client's story, and that's why this is, this is a reason to disbelieve his story, a reason to believe that he's making it up, that that violated Doyle. And I think if you look at the context of that, the AUSA, I think, was pointing out other reasons why the defendant's story didn't make sense. He had been talking about reasons, about the factual, the content of his story rather than the timing of it. He was saying, look, it doesn't make sense because, for instance, you said that the stabbing occurred during the daytime and, you know, she's at the hospital at night. Or you said she stabbed her, I stabbed her three times and she has seven stab wounds. It was things like that. The point is, had he given his story at all prior to the trial? He had not. Okay, well, I mean, the fact that the statement, even the defense lawyer doesn't know his story still implicates the fact that he's, the inference that I think the defendant is trying to counteract is the inference that he's fabricated his story. I mean, the fact that the defense lawyer, even the defense lawyer doesn't understand and know his story, the implication is he's making it up, right? Well, I think, yeah, it is, but it's a proper inference because one thing that the defense attorney did. Yes, but then one thing on that link, one link in that chain is he's making it up and he didn't tell, he did not speak about this story before now, which again brings us into Doyle land, right? I don't think so, Your Honor, because what happened is during the redirect of the defendant, defense counsel and Mr. Key did sort of a physical reenactment of what, of how the stabbing took place, how he was being choked and so forth for the jury. And during that, the prosecutor, what the prosecutor said later is Mr. Key had to tell him, had to tell defense counsel, no, wait, this isn't how it happened, this is how it happened. And that's what he's talking about at that point. He isn't talking about, oh, you didn't tell your story before, but the fact that they, that they're not on the same page with respect to what happened is an indication that he's making it up. And he had a lot of other things to say on that point as well, a lot of other reasons in that argument. And then in the initial, the same thing for the remark at the end. The remark, that's the second remark I'm going to now. The second remark is. And I don't want to delay you too much, so quickly just mention the second remark. Right. So what he said is, that's where defense counsel says, look, this doesn't make sense and this is, he's making it up and his story doesn't make sense. All right, got it. And it had been a theme of the closing, you can look at pages 597 to 601 and 628, or 629 to 631, of both the, the theme of both the initial and the rebuttal closings were both, there are a lot of things that he's saying here that just don't make sense. And focusing on a lot of the details of what he was saying. Okay. I appreciate that. Thank you. Thank you, Your Honors. If you wouldn't mind, and you don't have to take it, Mr. Standifird, but if you'd add two minutes to whatever time you had, please. I'm, of course, happy to answer any questions that the court has, but I just wanted to make a couple of points. The first, this kind of harmless error argument about how, how the trial would have gone differently had the, had there been an objection and the court made a correct ruling, that's not the way this is done. The way this is done is that the trial would have gone differently is you look at the error and determine whether there's a reasonable probability that it had an impact on the jury's verdict. You don't recreate a trial in which an objection is made. We speculate about what the court's ruling would have been and that sort of thing. That's, it's an interesting theory, but it's not supported by the, by the cases. To your question, Judge Ebell, about the arraignment, we don't have any information about the arrest. There's just nothing in the record about his arrest. We know there were Miranda warnings at both arraignments, which presumably the first one happened pretty soon after he was arrested. And in Brecht, which is one of the main cases we rely on from the Supreme Court, it's the same fact pattern. The Miranda warnings were given at an arraignment, and the questions that the prosecutor asked and the argument that the prosecutor made were essentially identical, and the Supreme Court said that those crossed the Doyle line. What about the two statements that are disputed? What is your response to that?  To take the attorney one first, if you look at this in context, the prosecutor had already violated Doyle two, three times by the time that statement was made. So this is a running theme in the prosecutor's argument. What this argument was designed to do was to add punch to the Doyle violations to say, he didn't tell his story before trial. He didn't even tell his attorney this story before trial. So it's part and parcel of the violations as a whole. I think if you view it in isolation, then maybe it's a little bit on shakier ground. But if you look at it in terms of the argument that the prosecutor was making throughout the closing, it's clearly part and parcel of the Doyle violations. I think, you know, a second point on that is it just wasn't a very good argument anyway. I mean, what the prosecutor says, the reason he says that the defense counsel didn't know the story is because the defense lawyer hadn't cross-examined Ms. Chinchillas about the defense. There's all sorts of reasons that he might not have done that. Maybe he didn't even know if his client was going to testify at that point. So it's just weak. And a third point on that is that the prosecutor knew that that was not true. I mean, there was a bench conference early on in Mr. Key's testimony. It was before he got into his story of what happened on the night in question where defense counsel summarizes what the testimony from Mr. Key was going to be. So for the prosecutor to then stand up in closing and say he didn't even tell his own lawyer the story, he knew that that was wrong. The second disputed statement is, let me get the exact language here, was that when the defendant testified, he completely made up a story that doesn't make any sense. That's just saying that he made up the story on the stand, which is the same thing that the Doyle violations had already done. And as I understand the government's brief, what they're saying is, well, all we were saying is that his story doesn't make sense, but that's not consistent with the statement itself, which is that when he testified, he completely made up a story that doesn't make any sense. So again, this remark came after the prosecutor had already violated Doyle three times, the third violation being just six transcript pages before this. So again, it's part and parcel of this whole strategy, which was all Doyle violations. Well, let me ask this question just so that we play this out a little bit. I mean, assuming that we decide not to even pay attention to the other two violations, alleged violations, do you win still? Yes. Yes. I think we definitely win still because we still have a violation at cross, violation in opening closing, the initial closing, and a violation in rebuttal closing. Because even under your theory, these just reinforce and bolster the Doyle violations that are uncontested. That's correct. Yeah, that's correct. I don't really think you have to address them all because they really don't chip away the claim to just take them out of the case. All right. Unless the court has further questions, I'll cede the remainder of my time. Thank you, counsel. Thank you. Thank you for your fine arguments, counsel.